You're a brave man. I always instruct the clerks not to put water anywhere near me. Unwired Planet v. Google, Mr. Arends. May it please the court. The district court erred in this case by diminishing the full scope of Unwired Planet's foundational inventions. Each of Unwired Planet's patent inventions should enjoy the 20-year protection supplied by our patent system, regardless of changes in technology used to implement them. In this case, the district court consistently erred by reading specific implementation features into the claims that overly narrowed them. I'd like to start our discussion with the 240 patent and highlight those errors. The first term that I'd like to talk about is proxy server. And the court introduced two errors into the construction there. One is that the proxy server must map and translate. And the second is that there has to be communication between two networks that could otherwise not communicate. You have a lot of claim constructions here. Can I move you on to one that concerns me? The 016 patent and the whole long thing about processing things to represent a graphical representation. Can you address that one? Yes, Your Honor. I refer to that one as the marker information term because that's really where the dispute is. And the issue there is whether that marker information has to be graphical. And the patent clearly says it doesn't. If we look at the 016 patent specifically, and I can point you to APPX 142, column 10, lines 13 through 19. Sorry. Say that again. Sure. It's APPX 142, column 10, lines 13 through 19. What the patent says is the marker information includes information sufficient to define a graphical representation of the mobile resource location. What does that mean? Defining a graphical representation? It simply has to provide the information such that you could draw a crosshair or a dot, but it doesn't have to be the crosshair or the dot. So a latitude and longitude could be... Wait. So does that... Is what you're saying the processing at the network location at the server node doesn't have to actually send the information of the graphical representation, but it sends information sufficient for the mobile unit to provide a graphical representation? The server does not have to provide the graphical piece as it sends it down. It can send the information that could allow the mobile device. But the mobile device... I mean, there has to be a graphical representation here somewhere, right? Yes, Your Honor. There does. But your construction doesn't have any reference to that. I mean, I see your point that the district courts may have required... Frankly, I don't... I have a hard time reading the district court's construction to mean anything, but to the to provide a graphical representation. That doesn't seem consistent, but yours omits the words graphical representation altogether. Well, what our construction says is it permits rendering, and that's what has to happen either at the server or at the mobile device. What do you mean by permits rendering? It just has to allow there to be a drawing made. So the marker information could be simply coordinates, latitude and longitude, but it could be more. It could be an instruction from the server with that marker information that says draw these dots or draw these crosshairs on the mobile device. But the mobile device ultimately has to put together some sort of bitmap and has to display a graphical image. Yes, Your Honor. Do you agree with that? Yes, Your Honor. Don't disagree with that. So why doesn't your construction say permits rendering of a graphical representation? Is there anything wrong with that? That would be a proper construction. You're saying that permits rendering implies a graphical representation, but I'm a little worried that maybe it doesn't and that you're trying to read graphical representation out. We're definitely not trying to read graphical representation out. It just has to allow the phone to do that. So if we inserted the words graphical representation into that and said permits rendering of a graphical representation on the client node, you'd be okay with that? That would be a proper construction, Your Honor. Okay. Unless there's other questions on the 0 and 6, I'd like to talk about the proxy server in the 240 patent. So the district court introduced two errors into the proxy server term, and that is that there must be mapping and translation and that the two networks could not otherwise communicate. And if we read the specification in the 240 patent, we just see that that's not required. There is no disclaimer. There is no disavow. There is no lexicography that causes either one of those two limitations. They're not in the claims. They're not in the specification as a requirement. They're in a preferred embodiment. I have a question for you. So the proxy server in the 240 patent, as it's described, it seems to say over and over again that its job is to translate. And I understand your point about advancing technologies, particularly with respect to this patent. But the fact that it says over and over that the proxy server's job is to translate, why is it that the district court erred when there doesn't seem to be any express language saying that the proxy server wouldn't perform that function? I think I can – well, number one is that the language that you're referring to is all within the description of one preferred embodiment, the mapping and translation point. It uses the word generally in that portion of the patent, which I'm sure your honors are familiar with. But if we were to look at figure 5A, APPX171, I think that'll directly – Well, you say generally, but then you say hence one of the functions is to. Right, because in that embodiment it can do that, but it doesn't have to. And I can illustrate that for you in figure 5A. So if we look at figure 5A, we see the devices that are there. And this figure is used to describe multiple embodiments. If we look at 502, one of those embodiments says that that provisioning entity could be a mobile device. So in that circumstance, that provisioning entity, we would select UDP, and that would be the protocol between the fleet server. There are disclosures in the patent that also say that the fleet server and the proxy server can be directly connected or they can be in the same box. So if that was the case, we would have direct communication between those two. And then if we went to the mobile station on the other side, we'd have UDP. And so if you took that embodiment, you'd have UDP on one side, UDP on the other side, direct communication between the servers. You do not need two protocols. You don't have them there. You have one. You don't need mapping and translation. You can practice the invention in that embodiment that is expressly described there in figure 5A. And the patent makes clear that – Is there a discussion of this drawing somewhere in the specifications? There is. It describes – it does – I will tell you it does not describe it that way in the way I've just done it. But the fact of the matter is there is discussion about the protocols between the provisioning entity and the fleet server. There is discussion about the direct communication between the proxy server and the fleet server. And there is discussion about using UDP to communicate with the mobile stations and that is not necessary. Does that mean that the – following along with Judge Wallach's point, does that mean that the proxy server has to be capable of performing the translation functions? Well, I believe that it is one of the functions that the proxy server can perform if it's claimed, but it's not necessary. The description of the proxy server says it does traditional server processing and it can also do mapping and translation. I think it would depend on what – how you did your embodiment. If you needed mapping and translation, then the proxy server would need to do that. If you have an embodiment that doesn't have two protocols, you don't need mapping and translation. What – I think the district got a little hung up on the idea of what does it do if it doesn't do mapping and translation. So what's your response to that? Right. What the proxy server does is it links the land net and the air net. It is a link in the communication. It's the server that sits on the edge of the two networks and sends the information that it gets from the fleet server to the mobile stations. And Google makes the point in their brief that if that's only the case, then you could read the proxy server completely out of the patent, but the patent actually contemplates the fleet server and the proxy server being in the same box. So the idea that it's not doing anything, it's the functionality that causes the sending of the information that the proxy server does. What's your view on the word proxy and how does that factor into it, if at all? Essentially, the proxy server is acting on behalf of the two different networks that it's working with, and that's what a proxy does. For example, if I gave you my proxy, you could go vote for me, and that's essentially what the proxy server does in this circumstance. For the land net, it sends the fleet data out to the mobile devices. For the air net, it authorizes the accounts and discusses and communicates with those mobile devices. So those are the things that the proxy server does that are described in the patent but are not limited to mapping and translation or two different protocols that could not otherwise communicate. If I could move on to user accounts. Can I ask one more question? Yes, ma'am. On the 760 patent, you talk about a proxy there. I realize it's not the 240, but in that one, there's some discussion of protecting the identities of mobile devices. But you don't see that at all in the 240 patent. So I'm just thinking about, again, going back to the idea that is the 240 patent, is the proxy really just for translation? If you meant it for protecting identities, for example, wouldn't that be in the specification? Well, the main point there is the 760 and the 240 patents are not related patents. They're different inventors. They were filed much later. The 760, I believe, was filed much later in time, I believe 2001 or 2002. And so I really don't think you look to the 760 to figure out what proxy server means in this patent with respect to the specification that we have here. Just so you know, you're into your time. I think I'll reserve. Good morning. Gregory Stone for Google. Mr. Stone. There are three patents at issue, and each patent has a claim term that is dispositive of all of the allegations of infringement as to that patent. Those three terms are reduced image, proxy server, and server note. Let me turn first, if I might, to the proxy server, which the court had some questions about, and try to address that first. The proxy server clearly means something more than a server. That's why the word proxy is used. And the specification at A179, column 8, lines 46 through 48, tells us that a proxy server performs not only the traditional server processing, but also serves to provide protocol conversion processing from one communication protocol to another. That's point one. Point two is the language of the claim says this proxy server enables communication. Wait, wait, wait. Back up to that. Yes. So you're on, make sure I'm in the right place. 179, column 8, line 46. Is that where you are? Yes. But doesn't it follow up by saying, according to the present embodiment? I mean, I get that there are definitions up here where the proxy server certainly requires translation and mapping, but does it always require translation and mapping is the question. Yes. And it does. It does because when you look at the language you're pointing to, I think that's the embodiment. They then go on to talk about a mapper, but they tell us before that what the proxy server actually does. It has to be different than a server. The additional functions that a proxy server performs in this instance, and there are different kinds of proxy servers, as I think Judge Stoll's question revealed, but I think in this instance the specification tells us what kind of proxy server it is. It also is one that enables communication between two networks. The plain meaning of enables is to make possible something you couldn't otherwise do, so that the use of the word enables also adds sort of confirmation that the court's construction here is correct, that you have two communication protocols that cannot otherwise communicate, and so it needs to be enabled through the proxy server. Aren't there ways it can enable communication without translation or mapping? Can you do other things in addition to translation and mapping? Professor Jaffe described in his declaration that the terms translation and mapping really describe the universe of the types of things that you would do to enable two networks that otherwise can't communicate to communicate. But you're putting in the two networks that can't otherwise communicate, but if you have two networks that can communicate, can't there still be a proxy server that performs other functions? You could have a proxy server that performs other functions. Yes, that would be a different kind of proxy server. That enables communications. No, it would not be one that would enable communications. I think here, and he talks about address translation or mapping, that's one of the things Professor Jaffe talks about as one of the ways you would translate or map. That would be another use of the proxy server that would fit within the court's construction. But I think a completely different proxy server that doesn't enable communications between two networks that can't communicate would not fit within the construction. And the specification tells us... I'm not by any means an expert in this, but can't you use proxy servers for anonymity purposes or for security purposes? Yes, you can. Why isn't that enabling communication? That would be for a firewall purpose. I don't think that enables the communication. That enables security. There's no indication on the record that a person of ordinary skill in the art would understand that to be enabling communication. What about T-Pending Claim 6, which talks about the proxy server comprising an account manager to manage a plurality of user accounts, push fleet data to certain accounts, and then also there's a description in the patent that the proxy server works with the fleet server to make sure that there's authentication so that the communication could occur. Why isn't that enabling communication? I don't think that... I think that is enabling the authentication, not enabling communication. But the authentication enables the communication. And we know that that authentication occurs in part through the account manager, which is also shown in the figures as a separate box, which is sometimes part of the proxy server. So there's a separate function. The account manager function is a separate function included as part of the proxy server, but not the use of the proxy server that is at issue here as construed by the court, which is... The one other point I want to make is they also tell us that the proxy server is sometimes referred to as a network gateway server. And the network gateway server, as Professor Jaffe explained in his declaration, citing to a federal glossary of terms used in networks, and that's at A-2509 is where he cites it in the glossary as A-2695, is a server that connects different network protocol technologies by performing the required protocol conversions. And that's exactly how it's used here. So we have three instances in the specification. The description of how this differs from a traditional server, the fact that it needs to enable communications, and the reference that it is sometimes referred to as a network gateway server, all three are consistent with the court's construction. But here, as shown in Figure 5 as a good example, it shows that there are different protocols on the one side and on the other side, and those different protocols need to be enabled communication between them, which is the role of the proxy server. Because there we have an HTTPS messages shown between the proxy server and the fleet server. Let me turn... I was going to say, do you want to talk about the server node? Yes, let me talk about the server node. So the server node is also a dispositive claim with respect to the 016 patent. The court there, and I think the parties agree that the standard of review here is whether or not the court's construction was clearly erroneous. The court in that instance... But why is that? Because I think the extrinsic evidence that was relied on was a dictionary definition that said, I think it limited it to one computer. But I thought the district court here didn't limit the construction to one computer. It said it could be one or more, each of which have to perform the claim functions. Yes, I think the district court had... The reason that here the standard is clearly erroneous is first and foremost because parties on both sides of the case agree that that's the appropriate standard. If it's a legal question, the parties can't agree to what the correct law is. That's, I think, something that the court determines. And beyond that, there was, in addition to the dictionary definition, which the court considered, there was testimony from the inventor, which was cited both by Google and by UnWired to support their respective positions on this. So the question was, there were two-fold questions. What is a server node? And the court determined it is, as the inventor testified, a point in the network, an intersection or crossing point. And then the court said, but you could have multiple of those. So you could have a computer here that is a server node. You could have another computer here that is a server node. But looking to the dictionary definition, which was disputed by the inventor's testimony, the court said each computer needs to perform all of the functions required by the claim. And the difference is the inventor had said each of the computers doesn't need necessarily to perform all of those functions. So the evidentiary conflict was between whether each computer needed to perform or did not need to perform all of the functions. The district court resolved that in favor of the position Google had put forth, which was that each computer needs to perform all of those functions, hence the court's construction, which I think— You said something interesting. You said that the district court relied on the computer dictionary to say that each computer must perform the functions. Where is that? Because I thought the court was relying on that one number versus Google case for that point. No, I think what the court had before was the dictionary. What language are you relying on? The court does not reference the dictionary in her construction. Got it. So she has the evidentiary record before which she resolved and said she resolved on the basis—she said she made her determination on the basis of all of the extrinsic evidence, which was in conflict. And as you know, she rejected the specific instruction of each party and developed her own construction. In that construction, what she says is each computer needs to perform all of the functions. That's consistent with the dictionary. How do I know what factual findings she made in support of the extrinsic evidence? How do I know what that is? I think in this instance, as we sometimes saw reference to in TEVA, that the factual finding is itself the construction. The construction itself reveals the factual findings without any subsidiary findings behind it. The dictionary definition here says one computer, and the construction is one or more. And the construction is one or more because I think what she was looking at was also the evidence that this server node could be distributed in the sense—or could be dispersed in the sense that you could have multiple of those in the network, but each given one, consistent with the claim language, which starts with a server node, and then thereafter in the claim says said server node, the server node, indicating that each of the separate functions will be performed by the server node that you first started with, indicating all the functions need to be performed by each computer. But the use of the word a server node at the outset of the claim is consistent with the fact that you could have multiple of these computers, each of which could perform those functions. Let me turn, if I might, to the holding of invalidity with respect to two of the claims. Can you just briefly—because I want to go back to that graphical representation thing. It may not be all that dispositive, but your friend agreed to add that term to their proposed construction. Can you just address that to—I mean, is their proposed construction with the addition of graphical representation good enough for you? What's the difference between the two? I think the difference is whether you say it's sufficient to render or it permits rendering. What permits rendering says is we're not going to prohibit you from rendering it, but all of the work can be done on the mobile device. At the time these patents were filed for, mobile devices couldn't do that kind of work. So you think that this claim language suggests that the server has to provide the actual rendering?  So it sends the bitmap, in one example, it sends exactly what the graphical representation would be. It tells you we're going to have you place an X, we're going to have you place a circle, we're going to have you place a cursor, whatever. That graphical information is what has to be provided by the server to the mobile device, yes. And I think that's where the language of permitting it is not consistent with what was claimed to be the invention. The invention claimed that we'll send that graphical information so that it's sufficient and all that the mobile device has to do is then display the information that has been sent to it, which is overlaid on a map. You started your argument saying three key constructions and you did proxy server and node. Yes. What was your third one? Okay, the other one is reduced image, Your Honor, and let me do reduced image. That I think is easy. I think the plain language of reduced image is you take an image and you make it smaller. You don't make it smaller by only putting up a portion of the image or cutting part of it away. It is clear in three places in the patent that all parts of the original image can be recursively viewed. If all parts of the original image can be recursively viewed, then the reduced image has to have all parts of the original image in it. That's in the abstract. That's in the summary of the invention. That's in the specification at A157, column 3, lines 18 and 19. We understand that the beginning of that hierarchy is the reduced image. Every step down then from that, it's going to have more detailed information, but you're going to be able to ultimately see all of the original image. That's made clear at column 8, lines 49 through 51, which is at A159. And this is exactly what the inventor's testimony was as well. The inventor said, I didn't mean by reducing it that you could crop it. He said, I mean by scaling it down or making it smaller, you retain the entire canvas of the image. So I think the court's construction there saying you cannot crop the image is indeed correct. And let me finish, if I might, with the invalidity of claims 17 and 31 of the 087 patent, which it was not disputed that the preamble is indefinite. The question was, is the preamble limiting? I think the answer to that is the preamble was limiting. The phrase, the image used, for example, in claim 17, the only way you find an antecedent basis for that phrase, the image, is to look at the preamble, which tells us that the image needs to be something that is much larger than the dimension of the screen. Without knowing that the image is much larger than the dimension of the screen, you don't really have any expression of what is claimed to be the inventive concept. That's now missing. You don't know the object upon which the invention acts. Exactly. So I think Proveros is on point here. I think it's clear that you need that language, and those two claims are invalid for indefiniteness. If there's any further questions? Thank you. Thank you very much. Mr. Arendt? I want to quickly address a couple of points that my friend made. First of all, the proxy server term is not dispositive of the 240 patent. Claim 27 is an independent claim in that patent that does not use the term proxy server. It uses user account. Secondly, Judge Hughes, you had a question about whether the proxy server could do something else other than map and translate. The answer is yes. It could do encapsulation. It could do a number of things. What is your response to his walking us through that diagram? Through which diagram? The only one he talked about. Figure 5 something. Figure 5? There's, again, that figure, if we look at it, does not require... First, to get to mapping and translation, you have to have two different protocols. And if you look at Figure 5A, you can set the preferred embodiment up in a way where there are not two protocols.  Oh, I'm sorry. You're the one that walked me through it. I should have asked him. It was convincing to me. Sorry. One more point is my friend raised the term gateway in Dr. Jaffe. The expert referred to gateway a number of times. And Google actually proposed gateway in a dictionary definition at the lower court. But that same dictionary had the term proxy server in it. It didn't have any of this mapping and translation that they want to read in. And they abandoned that evidence here at this court. I now want to jump to the 087 patent and address the reduced image. First and foremost, the reduced image dispute about whether it's uncropped arose at the claim construction hearing and was suggested by Google with no anchor in the specification. The word uncropped does not show up anywhere. And what we're dealing with is not a photocopier like in their brief where you just have a proportional scaling. What you have is a digital image that has to be reduced. And what you do with that is you get rid of pixels. You do that when you scale. You do that when you crop. But there are two different things. They are. They are. But there is no requirement that, for example, you couldn't just crop the first set of pixels all the way around the image and then reduce. What we're saying is reduction is okay the way Google says, but it's not the only way. One of ordinary skill in their art would understand that they could reduce the image in other ways than simple scaling. But you agree that it has to be the whole image just reduced. Your reduced image can't leave out parts of the actual image. Maybe it leaves out parts of the border around the image, but it has to be. Like the examples in the thing, the maps of the United States. Correct. You can't cut off Maine. You can't cut off. I mean, you can cut off them so long as they can all be displayed. That's the point. There's an embodiment. Let's see. I think what Judge Hughes is saying is your reduced image, while it might crop maybe the border around the United States, it can't crop so much that Maine is removed from the image that is displayed on the mobile device. That you can never get back to Maine? No. But when the reduced image is displayed, you can still see Maine. That's what he's asking. Well, I don't necessarily agree with that because there is an embodiment in the patent that says you don't necessarily start on the screen with the reduced image. You can go to a lower level. So long as you can get back to the information. But that doesn't mean the reduced image isn't the whole image. That just means you don't start with the reduced image. The reduced image will be the substantive part of the image. I agree with that. But it's not going to be the exact same image because it has to be transformed because it has to get smaller. Does it have to have Maine? That's the question. If it's the whole map, you have to be able to see the whole United States recursively. So, yes, it has to have Maine, Your Honor. In that instance, it's not cropped other than a border. It could be cropped. It's one way to reduce the image to be displayed on the mobile device. Is it a situation like when you go and you've got different pictures being made, like a 5x7 picture versus a 4x6 picture, that inherently some parts are going to be cropped when you but it doesn't mean that you're not still displaying Maine, for example? I would agree with that, Your Honor. The significant portions of the image will be there, but the superfluous area like the white border, and we highlighted that in our brief, is much smaller. How is that reflected in your proposed claim construction? Because if you're simply saying uncropped, it's really broad. Yeah. Uncropped is really broad, and it's not required. And so that's why we agree on the construction of it. I guess what I'm trying to say, how does your claim construction account for the idea that while you can crop, you nonetheless have to be able to see the entire original image? Why shouldn't you say a version of the entire image with smaller dimensions? Because the issue is it's not really the entire image because those pixels are going away one way or the other, if it's scaled or if it's cropped. For example, the patent talks about going from, I believe, 480 to 640. That's the original size of the image, and it goes to 70x60. You lose data. You lose those pixels regardless if it's scaled or if it's cropped. So it's not always the original image. And actually the specification specifically says that the reduced image is transformed. And so that image is not the exact same image. You just have to have the ability to see the detail of the original image, if that makes sense. It does and it doesn't. It doesn't in the sense that cropping actually removes part of the image as opposed to reducing the detail. In a digital image, when you do the linear interpolation that's described in the patent, you're averaging pixels together. So you're losing information from the image. And it's the same thing with cropping. You're losing those pixels that are no longer displayed. And what our position is is that one of ordinary skill in the art would understand that you could do either one of those things in total or small degrees to get the reduced image. Thank you, Counselor. Thank you.